UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
MELISSA TASHIA CARTAGENA,                :
                                         :   **MEMORANDUM DECISION AND**
                      Plaintiff,         :   **ORDER**
                                         :
        - against -                      :   22-cv-1200 (BMC)
                                         :
COMMISSIONER OF SOCIAL SECURITY,         :
                                         :
                      Defendant.         :
----------------------------------------------------------- X

**COGAN**, District Judge.

1.	Plaintiff seeks review of the Commissioner of Social Security's decision that she is not disabled as defined in the Social Security Act and its regulations for the purpose of receiving disability insurance benefits under Title II of the Act.  Following a hearing, the ALJ found that plaintiff had sufficient residual functional capacity ("RFC") to perform light work (20 C.F.R. § 404.1567(b)) subject to dynamic restrictions and low-stress workplace conditions, despite finding severe impairments of obesity, hemolytic anemia, diabetes millitus, depressive disorder, posttraumatic stress disorder, and anxiety disorder.

2.	Plaintiff raises one issue based on the ALJ's assessment of her physical impairment, and another as to her assessment of her mental impairment.  The physical impairment issue has two parts: plaintiff contends that her diagnosis of chronic heart failure and cardiomyopathy was severe (pursuant to 20 CFR 404.1520(c)), and that she met Listing 4.02 for cardiac dysfunction.  The ALJ did not agree with either contention, concluding that although she had a cardiac event, she had fully recovered and returned to normal functioning in less than twelve months.  If this conclusion is supported by substantial evidence, then plaintiff's argument fails on both points.

3. There was substantial evidence for the ALJ's conclusion. In fact, the evidence was overwhelming, although not uncontradicted, that plaintiff had fully recovered from her cardiomyopathy. In April 2019, she was hospitalized for an incident of reduced cardiac ejection fraction, which occurs when the heart does not pump out enough blood. This caused arm numbness and facial twitching. She was given medication and discharged. Seven weeks later, her ejection fraction had recovered to 55-60%, which was within normal range. By September 2019, her ejection fraction had risen to 75% (the higher the percentage, the better). Her cardiologists continued to assess improvement and recommended rehabilitation. In December 2019, plaintiff's primary care physician pronounced her fully recovered. All of this happened within a span of less than twelve months. To meet a Listing, the subject condition must continue for at least twelve months.

4. Despite a number of medical opinions showing plaintiff's full recovery – including a recommendation to go to the gym for bicycling, elliptical training, stair climbing, and treadmill use – plaintiff points to one medical opinion that came to a contrary conclusion based on plaintiff's self-reporting of tiredness and weakness. There is no reason the ALJ had to ascribe more weight to this opinion over all the other medical professionals. (Plaintiff also cites her physical therapist's estimate of her functional mobility capacity, but there is no indication that that was cardiac-related.) There was plenty of support for the ALJ's conclusion that plaintiff's cardiac condition was neither severe nor met the Listing.

5. Plaintiff's challenge to the ALJ's assessment of her mental impairment for purposes of determining her RFC raises a more substantial issue. When both a consulting examiner and a treating physician arrive at conclusions that, if accepted, would definitely require a finding of disability, and an ALJ rejects both, there either needs to be something seriously

wrong with both opinions or substantial evidence that outweighs them. That is the issue we face here.

6.      Plaintiff's consultative examiner, psychologist Dr. Scott Wilson, found a marked limitation in three functional areas: (a) using reason and judgment to make work-related decisions; (b) sustaining ordinary, routine, and regular attendance at work; and (c) regulating emotions, controlling behavior, and maintaining wellbeing. He found a moderate limitation in three areas: (a) interacting adequately with supervisors, coworkers, and the public; (b) sustaining concentration and performing tasks at a consistent pace; and (c) understanding, remembering, or applying complex directions or instructions. He found no limitation in three areas: (a) understanding, remembering, or applying simple directions or instructions; (b) maintaining personal hygiene and appropriate attire; and (c) awareness of normal hazards. His bottom line was that her impairments were "consistent with psychiatric problems and these may significantly interfere with the claimant's ability to function on a daily basis."

7.      Plaintiff's treating psychiatrist, Dr. Dolores Perez, who treated her along with other therapists at Bellevue, reported an even higher level of mental impairment. She found plaintiff extremely impaired in eight areas: (a) restricted in socializing; (b) deterioration in personal habits ("has home attendant"); (c) ability to maintain concentration, pace, and attention for extended periods of over two hours ("frequently checking stoves and doors"); (d) understand, carry out, and remember instructions; (e) respond to customary work pressures; (f) respond appropriately to changes in the work setting; (g) use good judgment on the job; and (h) behaving in an emotionally stable manner. She found plaintiff markedly impaired in seven areas: (a) relating to other people; (b) ability to sustain a routine without supervision; (c) ability to perform work activities within a schedule, maintain regular attendance, and be punctual; (d) respond

3

appropriately to supervision; (e) respond appropriately to co-workers; (f) perform simple tasks; and (g) perform complex, repetitive or varied tasks. She also noted that plaintiff was "easily overwhelmed and tearful." She found no tasks in which plaintiff's mental impairment would manifest as moderate or mild. She expected plaintiff would miss more than four days of work per month because of her mental impairment.

8.     Although different in their estimate of the degree of impairment, these are two medical evaluations from specialists who, unlike some others in the record, actually evaluated plaintiff through an in-person session (or, in the case of Dr. Perez and the therapists at Bellevue, numerous sessions) and reached opinions that, alone or together, could only support a finding of disability. The Commissioner notes that under 20 C.F.R. §§ 404.1520(b), 404.1520(c), and 404.1526, a single medical opinion is not controlling, but here, we are talking about two. Why did the ALJ reject them?

9.     There were essentially two reasons. First, she found Dr. Wilson and Dr. Perez's opinions inconsistent with the following testimony by plaintiff: she has no trouble watching and following shows on television; she uses a computer for social media; she helps her daughter with homework; she cares for a two year old and a teenager; she traveled to Florida and "express[ed] excitement around getting away"; she attends doctor appointments; and she has no problem getting along with people.

10.     Second, the ALJ found these medical professionals' opinions inconsistent with the record, and in the case of Dr. Perez, with the Bellevue treatment notes. The inconsistency with the record to which the ALJ referred, in addition to plaintiff's own statements, included the evaluation of state agency psychologist Dr. A. Chapman, who, on a records-only review, essentially found that plaintiff would not have any problems in the workplace.

4

11.     I have reviewed Dr. Perez's Bellevue treatment notes.  The ALJ and Commissioner rely almost entirely on the "Mental Status" sections of each treatment note, which are fairly consistent, although there are variations from the example below in that plaintiff often had "poor" rather than "good" eye contact; occasionally had "normal" rather than "minimal" insight; occasionally had "good" rather than "fair" ability to abstract; and occasionally had "good" rather than "fair" judgment.  An exemplar Mental Status section is as follows:

Mental Status

| | |
|---|---|
| Appearance | (P) Casually groomed, Good eye contact |
| Behavior | (P) WNL |
| Attention | (P) Alert |
| Attitude | (P) Cooperative |
| Speech | (P) Normal |
| Mood | (P) Angry, Irritable |
| Affect | (P) Full Range |
| Thought Pattern/Process | (P) No thought disorder present |
| Thought Content | (P) Unimpaired |
| Suicidal Ideation | (P) None |
| Homicidal Ideation | (P) None |
| Delusions | (P) None |
| Perception | (P) Unimpaired |
| Hallucinations | (P) None |
| Orientation To | (P) Time: Yes, Place: Yes, Person: Yes |
| Concentration | (P) Fair |
| Memory | (P) Unimpaired |
| Ability to Abstract | (P) Fair |
| Intellectual Functioning | (P) Average |
| Insight | (P) 3 – Minimal |
| Judgment | (P) Fair |
| Impulse Control | (P) Good |

12.     It is not clear how accurate a proxy this checklist is for a determination of plaintiff's ability to function in the workplace.  The snap-shot, surface-level evaluation at each session is not meant to predict functional capacity on the job, but rather, by definition, to determine the patient's mental status at the particular therapy session.

5

13. Moreover, the narrative of the discussion at each session almost always suggests a more severe impairment than the mental status checklist. For example, the treatment notes commonly describe plaintiff's behavior during the session something like this:

> The patient appeared 7 minutes late to session due to traffic. She expressed feeling anger about having a disappointing birthday celebration. She continued to express a great deal of anger that she feels related to various family members, ruptured friendships and previous work relationships. The patient and therapist considered the ways in which the patient copes with her anger and the negative impact her levels of anger have on her physical and emotional health. The therapist and patient considered other ways the patient could manage and reduce her anger. They also considered the patient's relationship patterns and how she takes on the stress of others in her life and how these relationship patterns relate to her feelings of anger.

In fact, after studying the summaries, I see only one session that could be characterized as a "good" or "optimistic" session, and there were "bad" sessions after that. If plaintiff brought the attitude to the workplace that she brought to almost every therapy session, there would be a substantial question as to whether she would last very long as anyone's employee. Of course, an attitude in a psychiatric session is not interchangeable with an attitude in a workplace, but I am not seeing the inconsistency between Dr. Perez's medical source statement and her treatment notes that the ALJ suggested.

14. That leaves us with plaintiff's testimony about her impairment and particularly her activities of daily living ("ADLs"), which the ALJ provided as a reason for rejecting the opinions of Drs. Perez and Wilson. The ALJ twice mentioned plaintiff's testimony that she had fun on a trip to Florida, and that her Bellevue therapists noted her report of attending a large family gathering and some birthday parties. I conclude that the ALJ should reexamine her opinion because these anecdotes are clearly inconsistent with the conclusions of the only mental health providers who examined plaintiff.

15.     In relying on a claimant's self-reporting of the degree of her mental impairment, particularly when it aggrandizes her functional capacity, a high degree of skepticism is required. We are, after all, talking about a mental impairment.  Where, as here, her therapists at all but two sessions thought she had "minimal" insight, the ALJ needs to focus on that in evaluating her self-reporting.  For example, when plaintiff says she has "no problem" getting along with people, she is likely not conveying as objective a standard as her mental health providers.  And Drs. Perez and Wilson certainly didn't agree with her self-prognosis, despite her description of her ADLs.

16.     This is not necessarily to say that plaintiff is making things up when she states that she uses a computer for social media, helps her daughter with homework, or focuses on a television program.  The question is how plaintiff's involvement in those activities informs her RFC; surely, the analogy is not intuitive. The ALJ needs to make a more apples-to-apples comparison, especially (again) because the only two psychiatrists who have met with her think she does not have the RFC that the ALJ found.

17.     Finally, I note that the ALJ relied, and the Commissioner relies here, on state agency psychologist Dr. A. Chapman, whose opinion supports the ALJ's conclusion.  I am not saying that an ALJ cannot rely on a non-examining provider like Dr. Chapman, but it bears noting that he did not have the benefit of Dr. Perez's medical source statement.  At rehearing, the ALJ may wish to hear from another psychologist or psychiatrist that not only has personally met with and evaluated plaintiff but has reviewed a complete record before opining.

18.     For the reasons set forth above, plaintiff's motion for judgment on the pleadings is granted, and the Commissioner's cross-motion for judgment on the pleadings is denied.  The case is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for another hearing limited to a reevaluation of whether plaintiff's mental impairment meets the Listing, and if not, a

more thorough consideration of the evidence, and to obtain additional evidence on plaintiff's mental impairment, if the ALJ deems it necessary. In reevaluating the evidence, the ALJ shall consider and address each of the points made above.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
October 25, 2023